UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                Case No. 18-CR-42

DAVID R. EGGLESTON,

        Defendant.

**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR ONE DAY IMPRISONMENT, FOLLOWED BY SUPERVISED RELEASE AND A PERIOD OF HOME CONFINEMENT**

**I.    Case Background**

Dave Eggleston bought All Modes (a freight hauling business) in November, 2001. Mr. Eggleston had spent much of his professional career in the freight-hauling industry and understood the mechanics of running such a business. Mr. Eggleston used nearly all of his savings and stock options from his previous employment in order to finance this purchase. Mr. Eggleston eventually struck a deal with the Racine County Economic Development Corporation to bring All Modes to Union Grove. The business bought 20 acres of land, developing 5 acres and constructing a new building.

At the time of purchase, roughly half of All Modes income came from shipping that was done for S.C. Johnson. In 2005 All Modes lost the S.C. Johnson contract. There were no financial problems at All Modes prior to that point. In addition to terminating its contract with All Modes, S.C. Johnson filed a civil suit against a variety of shipping companies and individuals, alleging that an individual within S.C. Johnson engaged in a

multi-million dollar kickback scheme in the contract awarding process. The civil suit dragged on for roughly four years against the various defendants. Mr. Eggleston went to trial and was acquitted of all wrongdoing. The legal cloud hanging over Eggleston caused permanent damage to All Modes because potential clients shied away from doing business with the company. The civil suit had a tremendous financial impact on Mr. Eggleston, costing him approximately $1.6 million in legal fees to defend.

Despite the loss of business from S.C. Johnson and the companion civil suit, All Modes remained in business and was able to meet its financial obligations. Profits within the freight-shipping industry can fluctuate wildly, however, and depend heavily on diesel fuel prices. Problems arose toward the end of 2008 and beginning of 2009 as diesel prices spiked to record highs and as the Great Recession took its toll generally on the economy. Mr. Eggleston realized that All Modes needed access to a line of credit to make up for gaps when money was owed but when invoices had not yet been satisfied. Community State Bank proposed entering into a Business Manager Agreement (BMA) in which All Modes assigned its valid receivables to CSB and CSB would pay money to All Modes for those receivables. In short, the BMA was a lending tool used to increase cash on hand by selling invoices. The BMA was effectively in place for two years (March, 2012 – April, 2014) until All Modes went out of business.

As noted, All Modes was experiencing financial difficulty by this time and money was tight for the business. Mr. Eggleston firmly believed he could make All Modes profitable again, but he also knew that if he couldn't pay fuel suppliers, for example, he would have to shut the doors or declare bankruptcy. Cash flow is a regular cause of concern for trucking companies like All Modes. Transportation companies like All

2

Modes often struggle with long wait times for payment, but must cover recurring expenses like gas and payroll. Transportation "factoring" is a solution that many companies have utilized. In this situation, a trucking company sells their unpaid invoices to a factoring company, receives a portion of the amount in cash nearly immediately, then the remaining cash is returned minus a small factoring fee, once the trucking invoices are paid in full.

The problem with factoring in Mr. Eggleston's situation is that it ran afoul of the language in the BMA, which required the company to only seek payment from CSB for loads that were actually delivered. But many of All Modes accounts (such as Quad Graphics) had regular shipments going out on a near daily basis. As such, there were future loads that had not been tendered, but which Mr. Eggleston knew would be delivered. In roughly November, 2012 Mr. Eggleston asked an employee to start billing the future loads through the BMA so that All Modes would open the following day with a positive account balance. All Modes was not double billing CSB. When the loads were ultimately delivered, one or more of the employees would go through the records and mark the invoice as paid, rather than submitting it again to the bank for payment. As reflected in the PSR, All Modes business never turned around and eventually CSB found out that future invoices were being submitted through the BMA. CSB cancelled the agreement and within 30 days All Modes was out of business.

Community State Bank commenced a civil lawsuit against seven defendants, including Mr. Eggleston and All Modes. The case was settled in September, 2015 with a judgment for $1,002,532. From the available records it does not appear that the bank has taken any steps in the last three years to collect on that judgment.

3

On the criminal side of matters, Mr. Eggleston pleaded guilty shortly after he was indicted. In the plea agreement the parties were unable to agree on loss amount and restitution. The defense employed a forensic accountant who conducted a detailed analysis of invoices in BMA, payments by Quad and shipments delivered for Quad. She concluded that $428,435 of CSB payments could have been fraudulent. The defense and prosecution eventually agreed to the compromise set forth in the Stipulation filed with the Court. In short, the parties agree on using $722,130 for guideline loss calculation and also agree that the restitution amount should be set at $428,435 with no restitution ordered for the bank's insurer. As part of the settlement, Mr. Eggleston liquidated his entire 401(k) account, which represents all of his retirement savings. On November 1, a $65,000 check was deposited with the Clerk of Court's Office, leaving a restitution balance of $363,435. Mr. Eggleston has further agreed to make $1,000 monthly payments toward the restitution balance.

**II.     Discussion.**

Mr. Eggleston presents to the Court as a 67-year old man with no criminal record. He had a stable childhood and comes from a good family. His brother, Kenneth, is a retired FBI agent. Mr. Eggleston is remorseful and embarrassed for his conduct. Because of that embarrassment, Kenneth was one of the only persons in whom Mr. Eggleston confided. Kenneth describes Mr. Eggleston as a devoted father who put his children through college and was always involved in their academics and athletic activities. *See* PSR at ¶ 50. Unlike the overwhelming majority of defendants in this situation, Kenneth noted that his brother did not profit from this personally. Mr. Eggleston always put his workers first and was proud to be able to employ people at his company. *Id*. Kenneth also

noted that Mr. Eggleston always put family first and is a man of faith. His two grandchildren adore him and, even as adults, Mr. Eggleston's children still rely on him for guidance and counsel.

Mr. Eggleston is currently employed at Frain Industries as the President of Frain Integration. *See* PSR at ¶ 62. Mr. Eggleston earns $190,000 per year. As sentencing has approached, Mr. Eggleston sat down with his employer and told him about this offense. The disclosure had no impact on his employment status and Mr. Eggleston remains employed full-time. Mr. Eggleston is committed to making good on his financial obligations. Mr. Eggleston has no plans to retire from his job and his goals for the future include marrying his girlfriend, seeing his granddaughters graduate, traveling and enjoying his family. Mr. Eggleston is an incredibly productive person who eschews luxury items, opting instead to live a modest lifestyle. His relationships are healthy. It seems entirely likely that Mr. Eggleston will adhere to the agreement negotiated with the government and continue to pay at least $1,000 per month toward restitution. As noted, in the civil realm the bank has never taken any action to collect its judgment, but that avenue remains available nevertheless.

Mr. Eggleston's employment history is remarkable. He has always maintained full-time employment and was a good father who raised strong, pro-social children. Mr. Eggleston also has a history of giving back to others. For example, when Mr. Eggleston found out that his next-door neighbor lost his job as a financial consultant, Mr. Eggleston anonymously pre-paid tuition for the man's children to finish their education at St. Benedict Academy. In the 1980's Mr. Eggleston was a "loaned executive" to the United Way. Mr. Eggleston spent segments of time working with people at the United Way to

organize fundraising efforts. He helped raise over $600,000 for the organization. Mr. Eggleston also regularly contributes to the Milwaukee Rescue Mission and he is a monthly contributor to St. Jude's Hospital.

Mr. Eggleston is an extremely atypical offender and this Court can be confident that he will not reoffend. First, he has already demonstrated a good-faith effort to resolve matters by settling his civil suit, pleading guilty on the federal case, and stipulating to a restitution figure with the government. Mr. Eggleston clearly has the capacity to make future restitution payments - the PSR reflects monthly net income of $10,000 from Frain Industries and $2,752 as social security income. *See* PSR at ¶ 64. Second, Mr. Eggleston did not commit this offense for personal enrichment or greed. Instead, he committed the offense in an effort to secure money for the business that would invariably be paid so that payroll and bills could be covered. Obviously submitting bills for future loads became impractical as the months went by, and funding was cut-off. When All Modes closed its doors, Mr. Eggleston had a stack of unpaid checks to himself in his desk drawer. He fought to keep the company afloat until the very end.

The United States Supreme Court has reaffirmed that sentencing judges should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue," because "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011). In order to achieve this, sentencing courts enjoy a high degree of discretion at sentencing, and should "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." *Id*. Ultimately, the

6

sentencing court's duty "is always to sentence the defendant as he stands before the court on the day of sentencing." *Id*. at 1242.

Further sentencing guidance has been provided by the Supreme Court in *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586 (2007), which detailed the proper sentencing procedure to be followed by district courts post-*United States v. Booker*, 543 U.S. 220 (2005). *Gall* directs that district courts should begin a sentencing proceeding by correctly calculating the applicable Sentencing Guideline range. *See Gall* at 596 ("the Guidelines should be the starting point and initial benchmark."). However, because the Guidelines are not the only consideration at sentencing, a district court must then give each of the parties an opportunity to argue for whatever sentence they deem appropriate. *See id*. After hearing arguments, the district court must then consider the 18 U.S.C. § 3553(a) factors[1] to arrive at a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing described in subsection (a)(2). *See id*.

### III. The factors listed in 18 U.S.C. § 3553(a), as applied to Mr. Eggleston's case, all support a sentence of one day in custody, followed by supervised release with a period of home confinement.

Almost every factor this Court must consider establishes that Mr. Eggleston has demonstrated extraordinarily good character throughout his life. Jail is unnecessary to achieve each of the sentencing goals. He does not pose any danger to the community and does not need any jail time to achieve the goals of sentencing.

---

[1] Subsection (a) of §3553 lays out in detail what factors a district court is to consider when sentencing a defendant, and include: the nature of the crime; the history, characteristics, and rehabilitative needs of the defendant; the public interest in protection, deterrence, and punishment; the type of sentences available; the applicable Sentencing Guidelines (including pertinent policy statements); the need for uniformity in sentencing similar defendants for similar crimes; and restitution.

Mr. Eggleston has no criminal record and is unlikely to reoffend. Mr. Eggleston's actions in this case are not a reflection of how he has otherwise lived his life. Mr. Eggleston is 67-years old and has no history of police contact. *See* PSR ¶¶ 40 – 46. Mr. Eggleston is a father of three children and he raised them to be productive and pro-social. His oldest son owns a restaurant in Chicago, his middle child is employed as a certified Veterinary Technician and his youngest is employed as an event coordinator. *See* PSR ¶ 52.

Unlike nearly all fraud cases Mr. Eggleston did not engage in this offense for personal enrichment. He ran All Modes successfully for many years but saw business deteriorate for reasons far outside his control. Literally all of the money that constitutes the restitution figure in this case was used for business-related expenses such as fuel and payroll. Mr. Eggleston did not embezzle or divert any money to feed a gambling or drug addiction.

Mr. Eggleston's strong character is underscored by his strong lifetime employment history:

1971 – 1981: he worked for Consolidated Freightways in Buffalo, New York. Mr. Eggleston started as a dockman and worked his way up to terminal manager.

1981 – 1984: he worked for ANR Freight Systems in Colorado as a Terminal Manager and was then promoted to vice-president, working at the Chicago office.

1984 – 1994: Mr. Eggleston started as the vice-president of K&R Delivery in Hinsdale, IL and was then promoted to executive vice-president.

1994 – 1999: Mr. Eggleston started at Ryder Integrated Logistics and was then recruited to be the executive vice-president of Tomra, It was during this time that Mr. Eggleston negotiated the purchase of All Modes.

Mr. Eggleston also has extremely strong and supportive social relationships. His girlfriend, Dr. Christine Wu is 70 years old and the two plan to marry. Dr. Wu is a professor at the University of Illinois-Chicago. As the PSR reflects, Mr. Eggleston is also a loving grandfather. His adult children still rely on him for emotional support and his grandchildren adore him. Any period of incarceration in prison will most likely ruin Mr. Eggleston's relationship with Dr. Wu and would be extremely detrimental to this tight-knit family.

Significant punishment has already been inflicted on Mr. Eggleston. He now bears the scarlet letter of a felony conviction on his record and faces the loss of rights he holds dear, such as voting. Mr. Eggleston has also suffered the financial consequences associated with All Modes going out of business and the companion civil suit that he settled. Additionally, Mr. Eggleston faces the financial consequence of having to pay a minimum of $1,000 per month toward restitution coupled with whatever additional measures the United States Attorney's Office may pursue to recover restitution.

Mr. Eggleston has also demonstrated that he is a person who accepts responsibility for his wrongdoing. He pleaded guilty to bank fraud, agreed to pay $428,435 in restitution to the bank and also agreed to liquidate his entire 401(k) savings to apply toward restitution. Mr. Eggleston has clearly demonstrated a good-faith effort to repay restitution, having already deposited $65,000 with the Clerk of Court. The entire restitution balance due and owing will be $363,435. On top of that, Mr. Eggleston has

9

committed to continue paying at least $1,000 per month toward restitution. The reality is that sending Mr. Eggleston to prison, at his age, will result in him losing his employment. It is unlikely that Mr. Eggleston would emerge from prison, with a felony and a work history gap, and be able to find gainful employment anywhere near $190,000 per year. Instead, he would likely be forced to survive on solely his social security income of $2,752 per month, of which $1,000 would have to go toward restitution.

Also significant is the lapse of time since Mr. Eggleston's offense. The conduct at issue ended 4 ½ years ago. Since then, Mr. Eggleston has shown that he is not a danger to the public. He has found extraordinarily gainful employment, paid taxes, maintained a stable residence, and formed a strong relationship with a supportive and intelligent girlfriend. Since his indictment in this case, Mr. Eggleston has maintained perfect compliance with all conditions of pre-trial release.

The loss amount also did not force Community State Bank out of business and there are no victim impact statements that have been submitted suggesting that Mr. Eggleston's behavior inflicted any particular harm on individuals within the bank.

As noted, this case is heavily mitigated in that the fraud did not personally enrich Mr. Eggleston. Literally every dollar provided by the bank went to cover payroll and business expenses. Mr. Eggleston accepts that he is personally responsible for repaying the bank the money that he never personally spent or benefitted from. The particular nature of this offense, coupled with his otherwise good character makes a sentence of one day imprisonment followed by supervised release with home confinement appropriate. It would also be consistent with other cases where this Court imposed sentence on defendants who actually stole and personally benefited from stealing large amounts of

money.  *See* E.D. Wis. Case Nos. 17-CR-80 (office manager stole approximately $431,000 from family-owned business and received 6 months jail followed by 3 years of supervised release); 17-CR-46 (two employees stole over $1.1 million from the Robert W. Baird Company: one was a manger, took $680,000 of the ill-gotten gains, and received 6 months jail followed by 3 years of supervised release; the other was an associate, took $440,000 of the ill-gotten gains, and received 3 months jail followed by 3 years of supervised release); 16-CR-190 (office manager stole just over $319,000 and received 6 months in jail followed by 3 years of supervised release).

This Court also presided over *United States of America v. Jennifer Goss*, 18-CF-81, where Ms. Goss embezzled hundreds of thousands of dollars from her employer while she worked as chief operating officer. The civil settlement in that case called for $750,000 to be repaid by Ms. Goss. Ms. Goss had further agreed to make $700 monthly payments toward that settlement figure. Ms. Goss was placed on probation for five years with a condition that she serve one year of home confinement.

The United States Supreme Court recognizes that probation (which conceptually is no different than supervised release) is a significant punishment because it is a substantial restriction on a person's freedom.  *See Gall* at 595-96.  Given the mitigated nature of the offense coupled with Mr. Eggleston's character, strong ties to the community, lack of criminal record, and age, a sentence along the lines proposed above is sufficient but not greater than necessary.

11
Case 2:18-cr-00042-LA   Filed 11/02/18   Page 11 of 12   Document 19

Dated this 2nd day of November, 2018.

                                                                  Kuchler & Cotton, S.C., Attorneys for
                                                                   David Eggleston


/s/
By: Anthony D. Cotton
State Bar Number: 1055106

Kuchler & Cotton, S.C.
1535 East Racine Avenue
Waukesha, WI 53186
262.542.4218
cotton@kuchlercotton.com