# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       **Plaintiff,**

   v.                                               **Case No. 18-CR-42**

**DAVID EGGLESTON**
       **Defendant.**

## STATEMENT OF REASON MEMORANDUM

Defendant David Eggleston directed employees at his trucking company to submit fraudulent invoices in order to obtain cash advances on a line of credit. The bank eventually caught on, terminated the loan program, and defendant's company ceased operations.

Charged with bank fraud, defendant pleaded guilty pursuant to an agreement with the government, and I set the case for sentencing. In imposing sentence, the district court must first correctly calculate the advisory sentencing guideline range, then consider the arguments of the parties and the factors set forth in 18 U.S.C. § 3553(a), making an individualized assessment based on the facts presented. After settling on the appropriate sentence, the court must adequately explain the chosen sentence to promote the perception of fair sentencing. United States v. Pankow, 884 F.3d 785, 793 (7th Cir. 2018).

## I. GUIDELINE CALCULATIONS

Defendant's pre-sentence report ("PSR") set a base offense level of 7, U.S.S.G. § 2B1.1(a), then added 14 levels based on the loss amount, § 2B1.1(b)(1), and 2 levels because defendant acted as a supervisor of the criminal activity, directing at least two employees to submit false entries to the bank, § 3B1.1(c), for an adjusted level of 23. Based on defendant's

timely guilty plea and acceptance of responsibility, the PSR subtracted 3 levels under U.S.S.G. § 3E1.1, for a final level of 20. Coupled with his criminal history category of I, level 20 produced an imprisonment range of 33-41 months. I adopted the PSR's guideline calculations without objection.

## II. SECTION 3553(a)

**A.    Sentencing Factors**

Section 3553(a) directs the sentencing court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory sentencing guideline range;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After considering these factors, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: just

punishment, deterrence, protection of the public, and provision of needed correctional treatment. Id. While the court must as part of its analysis consider the sentence recommended by the guidelines, it "may not perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case." United States v. Warner, 792 F.3d 847, 855 (7th Cir. 2015). "The Guidelines are an advisory starting point for a judge, but after correctly calculating a guideline range, the judge has discretion to select an appropriate sentence for the individual defendant and the surrounding circumstances." United States v. Musgraves, 883 F.3d 709, 715 (7th Cir. 2018).

**B.    Analysis**

    **1.    The Offense**

Defendant owned and was President of All Modes, Inc., a trucking firm with a principal place of business in Union Grove, Wisconsin. Defendant defrauded Community State Bank ("CSB"), which had entered into a Business Manager Agreement ("BMA") with All Modes, by causing All Modes employees to submit false information to CSB about All Modes' receivables, i.e., amounts All Modes claimed to be owed for completed trucking services.

Pursuant to the BMA, All Modes sold and assigned its valid receivables to CSB, and CSB in turn paid money to All Modes in exchange for those valid receivables. An invoice represented a valid receivable, under the agreement, only if it was an actual invoice for services All Modes had already performed for an All Modes customer and for which services that customer owed All Modes money. As part of the BMA, All Modes warranted and represented it would submit to CSB only valid receivables, that is, receivables for which All Modes had already performed services prior to funding.

3

Between approximately November 2012 and April 2014, defendant caused All Modes employees to make hundreds of false entries into the Business Manager Program regarding All Modes' claimed valid receivables and invoices. Those entries were false in that All Modes purported the entries represented valid receivables and valid invoices for actual services that All Modes had already performed for a customer, when in fact All Modes had not performed the services claimed in the entries.

Defendant later tried to match actual invoices with prior claims, but eventually he could not keep up. The bank noticed his claimed amounts receivable were exceptionally old and terminated the loan program. The company then closed.

By the time All Modes went out of business in April 2014, the company had submitted more than 500 false and fraudulent requests for payment. Through the false and fraudulent entries, defendant caused CSB to transfer at least $722,130 to an All Modes account.

**2.     The Defendant**

Defendant was 67 years old with no prior criminal record and an otherwise positive background. A high school and college graduate, he compiled a solid employment record, working his way up in the transportation industry, eventually obtaining his own company. After operating All Modes for 13 years, he found another job in the industry, which he had held for the past three-plus years.

Defendant had three adult children from a prior marriage and appeared to currently be in a solid relationship with plans to marry his partner, a university professor. His brother, a retired FBI agent, made a positive statement to the PSR writer. Defendant did not appear to have any substance abuse or other correctional treatment needs.

### 3. The Sentence

The guidelines called for a term of 33-41 months, a range largely driven by the substantial loss amount. This was a serious offense, which went on for years, involved hundreds of misrepresentations, and caused large losses to the bank. I also recognized the need to impose a sentence that deterred others who may be tempted to engage in similar fraud to keep their businesses afloat. For several reasons, however, I found that a sentence served in the community sufficed to satisfy the purposes of sentencing here.

First, the case was mitigated in the sense that defendant acted to try to keep his business afloat, not out of greed, to personally enrich himself, or to fund a lavish lifestyle. See United States v. Ranum, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level. For example, the guidelines treat a person who steals $ 100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child."). He promptly accepted responsibility for his conduct, expressed remorse, and made genuine efforts to pay restitution. Prior to sentencing, he made a substantial lump sum payment after liquidating his retirement account, and he agreed to thereafter make substantial monthly payments. Aside from any form of confinement or supervision I imposed, he had – and would continue to – experience significant financial consequences. See Warner, 792 F.3d at 861 (recognizing that financial penalties may serve as a deterrent).

Second, I saw no need to protect the public from defendant, given his age, lack of any prior record, and otherwise positive background. The record indicated that he had engaged in significant charitable endeavors, including work with the United Way and contributions to the

5

Milwaukee Rescue Mission and St. Jude's Hospital. See id. at 858 (holding that district court properly considered the defendant's charitable work as evidence of good character under § 3553(a)(1)). He had been able to find other work after his business closed and seemed to again be moving in a pro-social direction after this offense, which ended over four years ago. He also complied with bond, which further suggested that he would do well on post-conviction supervision and that prison was not needed to protect the public or deter him.

Third, a sentence served in the community facilitated the further payment of restitution, an important factor under § 3553(a)(7). Defendant had real earning potential, given his current employment, and unlike some defendants, for whom repayment was highly unlikely,[1] it appeared that he could make a substantial dent in the obligation here. A prison term would cause him to lose his job, and at his age – with a felony conviction – it seemed unlikely he would be able to obtain a comparable, well-paying job. This would seriously harm his ability to pay restitution and in turn harm the victim bank.[2]

### III. CONCLUSION

Balancing the seriousness of the crime against the mitigating circumstances and defendant's positive background, I found a sentence of time served followed by supervision

---

[1] In a recent report, the Government Accountability Office noted that most federal restitution goes uncollected. "Specifically, from fiscal years 2014 through 2016, DOJ collected the full amount of restitution on 4,003 of the 24,950 debts imposed during this time, 16 percent. However, across all debts, including debts imposed prior to fiscal year 2014, DOJ collected the full amount of restitution ordered on only 5 percent of debts. Across all restitution debts, DOJ collected at least some of the debt for one-third of debts and did not collect any restitution on the remaining two-thirds." https://www.gao.gov/assets/690/689830.pdf.

[2] I also considered the below-guideline sentences imposed on similar offenders in this district, as indicated in the defense sentencing memo, although every case is different, and none of those matters were perfect comparisons.

6

with a period of home confinement sufficient but not greater than necessary to satisfy the purposes of sentencing. I therefore committed defendant to the custody of the Bureau of Prisons for a period of one day/time served. I further required him to serve a period of three years' supervised release, with a condition of six months home confinement. As indicated, defendant did not have correctional treatment needs, and he did not pose a threat to the public, but I nevertheless wanted to impose a fairly significant supervision term to provide for financial monitoring and to ensure continued legitimate employment and payment of the remaining restitution.

Dated at Milwaukee, Wisconsin, this 9th day of November, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge